[L.A. No. 30765. Feb. 15, 1978.]

BRIAN W., a Minor, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
THE PEOPLE et al., Real Parties in Interest.

**COUNSEL**

Wilbur F. Littlefield, Public Defender, John J. Gibbons, Dennis A. Fischer, Kenneth I. Clayman, Elizabeth Ann Maloney and Albert J. Menaster, Deputy Public Defenders, for Petitioner.

John H. Larson, County Counsel, and John P. Farrell, Deputy County Counsel, for Respondent.

Gibson, Dunn & Crutcher, Robert S. Warren and Rex S. Heinke as Amici Curiae on behalf of Respondent.

No appearance for Real Parties in Interest.

## OPINION

MOSK, J.—We confront in a new context the frequently recurring conflict between the media and the judiciary, the two "institutions pedestaled in fragile loneliness by the Constitution" (Simons & Califano, The Media and the Law (1976) p. 1). Most controversies in this arena arise as a result of abrasive court orders to the press seeking revelation of confidential sources, preventing the gathering of information, or imposing gag orders. Here, by contrast, we have a petition inspired by a litigant seeking press exclusion despite a court order permitting press access to judicial proceedings.

By petition for writ of mandate, a 17-year-old juvenile seeks to exclude media representatives from the hearing at which his fitness to be dealt with under the juvenile court law will be determined. (Welf. & Inst. Code, § 707.) We are called upon to decide whether the trial court correctly ruled that representatives of the recognized news media may attend petitioner's juvenile fitness hearing. We conclude that the court was not in error, and hence that the writ should be denied.

Petitioner was involved in a minor traffic accident while driving an automobile owned by a woman who had disappeared earlier the same day. He was arrested and charged with grand theft (Pen. Code, § 487, subd. 3), robbery (Pen. Code, § 211), and receiving stolen property (Pen. Code, § 496). When the missing woman's body was found shot to death several days later, petitioner was charged with kidnaping for the purpose of robbery (Pen. Code, § 209) and murder (Pen. Code, § 187).

Because he was under the age of 18, petitioner was arraigned in juvenile court. (Welf. & Inst. Code, § 602.) The district attorney moved for a fitness hearing pursuant to section 707, subdivision (b), of the

Welfare and Institutions Code to determine whether petitioner should be tried as an adult.[1]

Petitioner moved for a closed hearing and an order prohibiting court officers and witnesses from communicating with any member of the news media concerning evidence presented at the hearing. The court granted petitioner's request for a closed hearing as to the general public, but ordered that "pursuant to Superior Court policy effective July 15, 1975, representatives of the recognized news media may attend proceedings in this matter on the condition that names of the minor and parents or guardian shall not be reported or disclosed by the news media." The court denied the request for a so-called gag order,[2] finding petitioner had failed to demonstrate a "reasonable likelihood" that he would be unable to obtain a fair trial.

Petitioner now seeks a writ of mandate to exclude media representatives from the fitness hearing and to impose a gag order on court officers and witnesses.[3] He argues that under California law juveniles are entitled to closed hearings, and that press attendance is inconsistent with the

---

[1]Section 707, subdivision (b), provides in relevant part: "In any case in which a minor is alleged to be a person described in Section 602 by reason of the violation, when he was 16 years of age or older, of one of the following offenses:

"(1) Murder;

" . . . . . . . . . . . . .

"(6) Kidnapping for purpose of robbery;

" . . . . . . . . . . . . . .

"(11) . . . upon motion of the petitioner made prior to the attachment of jeopardy the court shall cause the probation officer to investigate and submit a report on the behavioral patterns and social history of the minor being considered for unfitness. Following submission and consideration of the report, and of any other relevant evidence which the petitioner or the minor may wish to submit the juvenile court shall find that the minor is not a fit and proper subject to be dealt with under the juvenile court law unless it concludes that the minor would be amenable to the care, treatment and training program available through the facilities of the juvenile court based upon an evaluation of the following criteria:

"(i) The degree of criminal sophistication exhibited by the minor, and

"(ii) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction, and

"(iii) The minor's previous delinquent history, and

"(iv) Success of previous attempts by the juvenile court to rehabilitate the minor, and

"(v) The circumstances and gravity of the offenses alleged to have been committed by the minor."

[2]A gag order, in this context, is a term frequently applied to a court order designed to restrain freedom of expression.

[3]Because the request for a gag order is obviously intended to make effective an order excluding the media from the fitness hearing, we will focus on the latter.

confidentiality so assured. The statute dealing with persons who may be admitted to juvenile hearings, section 676 of the Welfare and Institutions Code, provides: "Unless requested by the minor concerning whom the petition has been filed and any parent or guardian present, the public shall not be admitted to a juvenile court hearing. The judge or referee may nevertheless admit such persons as he deems to have a direct and legitimate interest in the particular case or the work of the court."

Petitioner contends this section must be construed narrowly in light of other sections of the juvenile court law which reflect a strong legislative intent to preserve the confidentiality of juvenile proceedings: i.e., section 781, which provides for the sealing of juvenile records; sections 826 and 826.5, which authorize the destruction of such records; and section 827, which limits the persons authorized to inspect such records. The Legislature could not have intended to include the press among the class of persons with a "direct and legitimate interest in the particular case or the work of the court," he argues, as this would defeat the concern for confidentiality so clearly evidenced in the cited provisions. Petitioner misperceives the intended function of section 676.

The Juvenile Court Law was revised in 1961 upon the recommendation of a special study commission on juvenile justice which had been created by the Governor in 1957 and had issued a comprehensive report in 1960. (See generally Comment, *1961 California Juvenile Court Law: Effective Uniform Standards for Juvenile Court Procedure?* (1963) 51 Cal.L.Rev. 421; Boches, *Juvenile Justice in California: A Re-evaluation* (1967) 19 Hastings L.J. 47.) Section 676 was taken verbatim from the draft statute proposed by the study commission and added as a new code section. The commission explained the provision that was to become section 676 as follows:

"While the present law was intended to provide closed hearings, it can be interpreted to permit open or semi-public juvenile court hearings. The Commission, therefore, is proposing minor changes in the language of the law to make private hearings mandatory, unless the minor and/or his parents desire the public's presence.

"However, we do not intend that this recommendation be used to exclude bonafide representatives of the press from attending juvenile court hearings. In so stating, we are convinced the press will continue to respect their voluntarily adopted code of ethics, whereby the names of juvenile offenders are not identified to the public.

"We believe the press can assist juvenile courts in becoming more effective instruments of social rehabilitation by providing the public with greater knowledge of juvenile court processes, procedures, and unmet needs. We, therefore, urge juvenile courts to *actively encourage greater participation by the press.* It is the feeling of the Commission that *proceedings of the juvenile court should be confidential, not secret.*" (Italics added.)[4]

■ Explanatory comments by a law revision commission are persuasive evidence of the intent of the Legislature in subsequently enacting its recommendations into law. (*Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 249-250 [66 Cal.Rptr. 20, 437 P.2d 508], and cases cited.)

■ We conclude that in vesting the judge with discretion to admit to juvenile court proceedings persons having a "direct and legitimate interest in the particular case or the work of the court," it was the purpose of the Legislature to allow press attendance at juvenile hearings.

Moreover, this purpose is not inconsistent with the overall scheme of the juvenile court law. In the context of disclosure of detention records, this court in *T.N.G.* v. *Superior Court* (1971) 4 Cal.3d 767, 776-778 [94 Cal.Rptr. 813, 484 P.2d 981], recognized the Legislature's concern for preserving a confidential atmosphere in juvenile court proceedings; but we found the focus of that concern to be the lingering stigma of youthful brushes with the law. The provisions for confidentiality in the juvenile court law derive from the study commission's finding that "a juvenile arrest record has proven in many cases to be a serious handicap to a person later in life,"[5] and were included to prevent the underlying rehabilitative philosophy from being thwarted by unduly stigmatizing the juvenile offender. Admittance of the press to juvenile court proceedings under section 676 does not frustrate this purpose as the judge can exercise control over disclosure of the juvenile's identity.[6]

---

[4]Report of the Governor's Special Study Commission on Juvenile Justice, Part I—Recommendations for Changes in California's Juvenile Court Law (1960) page 24. Similar views were recently expressed by the Judicial Council in its advisory comment to rule 1311(e) of the new juvenile court rules. (Judicial Council of Cal., Annual Rep. (1977) pp. 34-35.) Rule 1311(e) tracks the language of section 676 and adds the condition that neither the name of the minor, parent, or guardian, nor any means of ascertaining their names be disclosed.

[5]Report of the Governor's Special Study Commission on Juvenile Justice, Part II—A Study of the Administration of Juvenile Justice (1960) page 110.

[6]We need not here decide whether and to what extent a court may restrain the press from disclosing a juvenile's identity. We merely observe that such restraints are clearly

Petitioner also contends that if he is certified to adult criminal court after his fitness hearing, press attendance at that hearing will yield prejudicial publicity and jeopardize his right to a fair trial. He anticipates that evidence adduced will include detailed and sensitive information about his family background and personal history, his previous delinquent record and court contacts, and statements he allegedly made concerning the offenses with which he is presently charged. Much of this evidence, he also asserts, will be inadmissible at trial, thus magnifying the prejudicial effect of dissemination by the press of information obtained at the hearing.

In rejecting this argument, the court below found that petitioner failed to establish a "reasonable likelihood" that he will be unable to obtain a fair trial. This finding has ample support.[7] After reviewing copies of the newspaper articles which deal with petitioner—without naming him—and the crime with which he is charged, we conclude that media coverage in this case has been neither excessive nor sensational; rather, the media appear to have reported responsibly about a matter of

---

not proscribed by recent decisions of the United States Supreme Court. In *Oklahoma Publishing Co.* v. *District Court* (1977) 430 U.S. 308 [51 L.Ed.2d 355, 97 S.Ct. 1045], the court held that the press could not be enjoined from publishing or broadcasting the name or picture of a minor child. The proceedings there, however, were not closed to the public, and the court was influenced by this fact. The court relied even more explicitly on the public nature of the relevant information in *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469, 495 [43 L.Ed.2d 328, 349, 95 S.Ct. 1029], in which it stated: "By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media."

In both cases, the court significantly emphasized that it was confronted with public business, a public event, or official records open to public inspection. Though prior restraints on publication always demand a heavy burden of justification (*Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 556-561 [49 L.Ed.2d 683, 695-699, 96 S.Ct. 2791]), the absolute ban on such restraints in *Oklahoma Publishing* and *Cox* applies only to information already in the public domain. The holdings in these cases, then, do not necessarily extend to juvenile court hearings that are not open to the public, but which media representatives are conditionally permitted to attend.

[7] We assume for purposes of this proceeding that the "reasonable likelihood" test, more favorable to petitioner than the "clear and present danger" standard, is proper for determining the appropriateness of imposing a gag order on those present at a hearing or excluding media representatives. (Compare *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 363 [16 L.Ed.2d 600, 620-621, 86 S.Ct. 1507], with *Nebraska Press Assn.* v. *Stuart* (1976) *supra,* 427 U.S. 539, 562-563 [49 L.Ed.2d 683, 699-700]; see also *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383-384 [66 Cal.Rptr. 724, 438 P.2d 372] (reasonable likelihood standard applied to change of venue); *Younger* v. *Smith* (1973) 30 Cal.App.3d 138, 159-164 [106 Cal.Rptr. 225] (reasonable likelihood standard applied to gag order).)

legitimate public interest.[8] Nothing in the record suggests that coverage of the fitness hearing, ordinarily an undramatic event, will be any less responsible.

Finally, petitioner overestimates the impact that even substantial publicity might have on the very large pool of potential jurors. Proceedings in this case are being held in Los Angeles County, which has a population of more than 7 million persons; the large number of people available for jury service, when coupled with appropriate safeguards in the conduct of judicial proceedings, makes it highly probable that an impartial jury can be impanelled. (See, e.g., *People* v. *Manson* (1976) 61 Cal.App.3d 102, 173-192 [132 Cal.Rptr. 265].)

■ The court can further lessen the impact of adverse publicity, if it occurs, by utilizing one or more of a panoply of measures available to protect the defendant and ensure the constitutionality and fairness of proceedings against him. Such measures include granting a change of venue, postponing trial until the effect of pretrial publicity subsides, conducting a searching voir dire, giving clear and emphatic instructions to the jury, and sequestering its members.[9] (*Maine* v. *Superior Court* (1968) *supra,* 68 Cal.2d 375; see also *People* v. *Tidwell* (1970) 3 Cal.3d 62 [89 Cal.Rptr. 44, 473 P.2d 748]; *Fain* v. *Superior Court* (1970) 2 Cal.3d 46 [84 Cal.Rptr. 135, 465 P.2d 23]; *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287 [95 Cal.Rptr. 798, 486 P.2d 694].) Postponement and change of venue are not entirely satisfactory remedies, of course, as they may indirectly affect the defendant's right to a speedy trial in the district in which the crime was committed.

However, the United States Supreme Court has repeatedly recognized the salutary function served by the press in encouraging the fairness of trials and subjecting the administration of justice to the beneficial effects of public scrutiny. (*Nebraska Press Assn.* v. *Stuart* (1976) *supra,* 427 U.S. 539, 559-560 [49 L.Ed.2d 683, 697-698]; *Cox Broadcasting Corp.* v. *Cohn* (1975) *supra,* 420 U.S. 469, 491-492 [43 L.Ed.2d 328, 347-348]; *Sheppard* v. *Maxwell* (1966) *supra,* 384 U.S. 333, 350 [16 L.Ed.2d 600, 613].) It has held these measures to be favored over direct restraints on the press.

---

[8]There was television coverage as well, but petitioner does not persuade us it was more excessive in quantity or sensational in quality than the newspaper articles we have reviewed.

[9]Although sequestration is ordered after pretrial publicity has occurred, it may nonetheless aid in dissipating the impact of such publicity on the ensuing trial.

(*Nebraska Press Assn.* v. *Stuart, supra,* at pp. 563-565 [49 L.Ed.2d at pp. 700-701].) Given the important role of the press in monitoring the administration of justice on behalf of the public, it cannot be said that the court here erred in refusing to exclude media representatives from the fitness hearing on petitioner's speculation that as a result he may find it desirable subsequently to seek a postponement or change of venue.

 We conclude, accordingly, that when past media coverage relating to a case has been neither excessive nor sensational and the jury pool in the jurisdiction is large, a court does not err in refusing to bar press representatives from a juvenile fitness hearing. Adequate safeguards are available, should they be necessary, to protect the defendant's rights if he is certified to adult court.

The alternative writ is discharged and the peremptory writ is denied.

Tobriner, J., Clark, J., Richardson, J., and Manuel, J., concurred.

**NEWMAN, J.**—I concur. I agree that defendant's rights can be safeguarded if he is certified to the adult court. We should not however, even impliedly, condone the "Rules for News Media Reporting Juvenile Court Proceedings" that were issued on behalf of the superior court's juvenile departments on July 15, 1975. Patently they accord privileges only to "representatives of the recognized media," and "[r]ecognized media are defined to include any of the print or broadcast media that regularly reach a significant part of the general population of Los Angeles County." The preference thus expressed for a "recognized" press indeed may flout article I, section 2, of the California Constitution, which states that "[a] law may not restrain or abridge liberty of . . . press."

In the rules, section 3 provides that the "name of the minor . . . or his parents or guardian shall not be reported nor shall any means of ascertaining such names be disclosed"; and the final sentence warns, "The media presumably will police itself relative to the above rules, knowing that departures therefrom would necessarily call for return to strict control of their access." Puzzling to me is the apparent lack of policing in this case regarding the fact that "A sketch depicting a left

profile view of the minor obtained at the arraignment was broadcasted on . . . KABC-TV Channel 7, during both the 6 p.m. and 11 p.m. news on March 22, 1977."

Finally, there may be an equal protection issue that unfortunately was analyzed neither in the briefs nor in oral argument. The United States Supreme Court has reminded us that "to transfer a child from the statutory structure of the Juvenile Court to the criminal processes . . . is, indeed, a 'critically important' proceeding." (*Kent* v. *United States* (1966) 383 U.S. 541, 560 [16 L.Ed.2d 84, 97, 86 S.Ct. 1045].) In some ways it parallels the transfer of an adult suspect from preliminary examination to criminal trial. Yet in that proceeding, at the request of defendant, the magistrate must "exclude from the examination every person except his clerk, court reporter and bailiff, the prosecutor and his counsel, the Attorney General, the district attorney . . ., the investigating officer, the officer having custody of a prisoner witness . . ., the defendant and his counsel, and the officer having the defendant in custody . . . ." (Pen. Code, § 868.) Those words imply no easy answer to the question raised here during oral argument, "Do we not come to the conclusion that adults get better protection than do children?"

BIRD, C. J.—I concur with my colleague, Justice Newman, when he expresses concern over the Los Angeles juvenile court rules which restrict admission to the sessions of the juvenile court to representatives of the "recognized news media." To grant admission to some news organizations while excluding others is to encourage the drawing of constitutionally impermissible distinctions, based on unavoidably vague and subjective standards as to what renders one organization more worthy of recognition than another.

In addition, two fundamental constitutional issues may be present in this case:

(1) Is the First Amendment violated when restraints are placed on the publication of information secured by the news media as a result of being admitted to juvenile court proceedings?

(2) Is the equal protection clause violated when a 17-year-old juvenile, who may face a jury trial in adult court, is first required to

undergo a *public* fitness hearing, a procedure he would not have to submit to were he an adult?

This case does not, however, adequately present these constitutional issues for resolution since neither was directly raised or argued by the parties. Consequently, I express no opinion as to the proper disposition of these issues, and I concur in the result reached by the majority.

Petitioner's application for a rehearing was denied March 23, 1978.