[S.F. No. 24253. Jan. 14, 1982.]

SAN JOSE MERCURY-NEWS, Petitioner, v.
THE MUNICIPAL COURT FOR THE SUNNYVALE-
CUPERTINO JUDICIAL DISTRICT OF SANTA CLARA
COUNTY et al., Respondents;
ALFREDO GARZA et al., Real Parties in Interest.

**500**

COUNSEL

Edward P. Davis, Jr., Randolph M. Paul, and Rankin, Oneal, Center, Luckhardt, Marlais, Lund & Hinshaw for Petitioner.

Cooper, White & Cooper, Robert M. Raymer, Margaret H. Edwards, Pillsbury, Madison & Sutro, Jerome C. Dougherty, Walter R. Allan, Joseph R. Tiffany II, Gray, Cary, Ames & Frye, Josiah L. Neeper, Edward J. McIntyre, Irell & Manella, Richard H. Borow, Harold E. Kruth, Kenneth A. Liebman, Lillick, McHose & Charles, Kenneth E. Kulzick, Lawrence W. Dam, Robert Fremlin, Gail M. Heckemeyer, Jack B. Purcell, Herbert M. Schoenberg, Jonathan Kotler, Donald L. Zachary, Edwin A. Heafey, Jr., John E. Carne, Judith R. Epstein, Crosby, Heafey, Roach & May, George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Herbert F. Wilkinson, Deputy Attorney General, Harold W. Fuson, Jr., and Rhonda Heth as Amici Curiae on behalf of Petitioner.

No appearance for Respondents.

Harry J. Delizonna for Real Parties in Interest.

Wilbut F. Littlefield, Public Defender (Los Angeles), Dennis A. Fischer, James M. Hallett, Deputy Public Defenders, Quin Denvir, State Public Defender, and Richard S. Kessler, Deputy State Public Defender, as Amici Curiae on behalf of Real Parties in Interest.

OPINION

**NEWMAN, Acting C. J.**—The San Jose Mercury-News sought mandate to compel respondent Otis, a judge of the Sunnyvale-Cupertino

Municipal Court who presided over a preliminary hearing in a felony complaint (People v. Garza et al., No. C80-25432), to vacate his order closing the hearing under Penal Code section 868 and to issue a new order opening the hearing to media and public.[1] The order is challenged on the ground that section 868, which requires a closed hearing at defendant's request, is an unconstitutional infringement on the public's right to attend.[2] We conclude that petitioner's arguments lack merit.

An indictment was filed in the municipal court against real parties in interest Garza, Hughes, Rogelio Sanchez, and Dolores Sanchez. Among other things it charged Garza, a member of the San Jose City Council, with taking bribes. Because of citizen interest, petitioner had reported the case extensively and was successful in opposing real parties' motion to seal the grand jury transcript. On October 30, 1980, petitioner assigned a reporter to cover the preliminary hearing; but before it began defendants obtained a closure order under section 868. The order was issued without any showing that real parties' rights would be prejudiced by an open hearing, and petitioner's representatives were excluded.

■ Petitioner and numerous amici argue that the federal and state Constitutions give the press and public a right of access to preliminary hearings that may be foreclosed only when outweighed by defendant's

---

[1] Section 868 provides: "The magistrate must also, upon the request of the defendant, exclude from the examination every person except his clerk, court reporter and bailiff, the prosecutor and his counsel, the Attorney General, the district attorney of the county, the investigating officer, the officer having custody of a prisoner witness while the prisoner is testifying, the defendant and his counsel, and the officer having the defendant in custody; provided, however, that a prosecuting witness may, in the discretion of the court, be entitled for moral support to the attendance of one person of his or her own choosing otherwise not a witness. The person so chosen shall not discuss prior to or during the preliminary hearing the testimony of the prosecuting witness with any person, other than the prosecuting witness, who is a witness in the examination. Nothing in this section shall affect the right to exclude witnesses as provided in Section 867 of the Penal Code."

[2] We issued an alternative writ. The municipal court advises that the hearing was completed without public or media attendance, and all defendants were held to answer on all charges. Therefore the matter technically is moot. We may, however, decide moot cases that present important questions affecting the public interest, especially in controversies so short-lived as to evade normal appellate review. (E.g., *Hardie v. Eu* (1976) 18 Cal.3d 371, 379 [134 Cal.Rptr. 201, 556 P.2d 301]; cert. den. *sub nom., Cal. Fair Political Practices Com.* v. *Hardie* (1977) 430 U.S. 969 [52 L.Ed.2d 360, 97 S.Ct. 1652]; *DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 58 [13 Cal.Rptr. 663, 362 P.2d 487].)

interest in a fair trial. Since section 868 permits no balancing of competing interests in individual cases, they urge, it contravenes the constitutional right.

A defendant's right to a fair criminal trial before an unbiased jury arises under the Fifth, Sixth and Fourteenth Amendments. (See *Duncan* v. *Louisiana* (1968) 391 U.S. 145, 149 [20 L.Ed.2d 491, 496, 88 S.Ct. 1444]; *In re Oliver* (1948) 333 U.S. 257, 273 [92 L.Ed. 682, 694, 68 S.Ct. 499]; also parallel provisions of Cal. Const., art. I, §§ 7, subd. (a), 15.) This court has stressed section 868's importance in helping defendant protect himself against bias from prejudicial pretrial publicity. (*People* v. *Elliot* (1960) 54 Cal.2d 498, 504-505 [6 Cal.Rptr. 753, 354 P.2d 225].)

The countervailing "access theory" asserts that the public's right to receive and disseminate communications about public affairs implies at least some right to acquire relevant information at the source. It draws on the right to assemble in places and at proceedings traditionally public. It presumes the deterrent effect of public scrutiny on official misconduct. And it emphasizes the unique role of the media in vindicating the right to know. (Note, *The Right of the Press to Gather Information* (1971) 71 Colum.L.Rev. 838-845.)[3]

The United States Supreme Court has identified limitations on the right of access. In *Zemel* v. *Rusk* (1965) 381 U.S. 1 [14 L.Ed.2d 179, 85 S.Ct. 1271] six justices rejected arguments that denial of privileges to travel to Cuba encroached on a citizen's First Amendment right to inform himself, ruling that "[t]he right to speak and publish does not carry with it the *unrestrained* right to gather information." (Pp. 16-17 [14 L.Ed.2d p. 190], italics added.) In *Branzburg* v. *Hayes* (1972) 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646] a five-justice majority suggested that "without some protection for seeking out the news, freedom of the press would be eviscerated" (p. 681 [33 L.Ed.2d p. 639]). But the

---

[3]As real parties note, the right to observe is distinct from the right to speak and write about what one has seen and heard. Denial of access differs from a "prior restraint" on publication of known information. (See *Gannett Co.* v. *DePasquale* (1979) 443 U.S. 368, 393, fn. 25 [61 L.Ed.2d 608, 630, 641, 99 S.Ct. 2898]; also p. 411 [conc. & dis. opn. of Blackmun, J.]; compare *Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 556-561 [49 L.Ed.2d 683, 695-699, 96 S.Ct. 2791].) In general, access restrictions are legitimate means of protecting fair-trial rights. (*Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 360-361 [16 L.Ed.2d 600, 619, 86 S.Ct. 1507].)

case held that a reporter has no "newsgathering privilege" to withhold the identity of confidential sources from a grand jury. Many incidental burdens on access to information, the court said, are proper. For example, the media enjoy no special right of access to places where public presence is properly restricted; they are "regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations" (p. 684 [33 L.Ed.2d p. 641]).

Later decisions, albeit again by slim margins, ruled that authorities need not grant special media access to prisons, which traditionally are closed to the public, at least so long as the public retains substantial alternative means of discovering information about penal conditions. (*Houchins* v. *KQED, Inc.* (1978) 438 U.S. 1, 10-16 [57 L.Ed.2d 553, 561-565, 98 S.Ct. 2588]; *Saxbe* v. *Washington Post Co.* (1974) 417 U.S. 843, 849-850 [41 L.Ed.2d 514, 519, 94 S.Ct. 2811]; *Pell* v. *Procunier* (1974) 417 U.S. 817, 834-835 [41 L.Ed.2d 495, 508-509, 94 S.Ct. 2800].) ■ In *Houchins* a four-member majority[4] reaffirmed that the First Amendment neither guarantees general public access to sources of information under government control nor accords the media access privileges beyond those of the public generally. (438 U.S. at pp. 11 [opn. of Burger, C. J.], 16 [conc. opn. of Stewart, J.] [57 L.Ed.2d at pp. 562, 565].)

■ Petitioner's and amici's arguments focus on two recent cases, *Gannett Co.* v. *DePasquale, supra,* 443 U.S. 368 and *Richmond Newspapers, Inc.* v. *Virginia* (1980) 448 U.S. 555 [65 L.Ed.2d 973, 100 S.Ct. 2814]. Those cases demonstrate, they urge, that a majority of justices now have recognized constitutional rights of access to pretrial criminal proceedings such as the preliminary hearing here.

In *Gannett*, five members of the court in four opinions agreed that the Sixth Amendment guarantee of a public trial for the accused in criminal cases creates no public or media right of access to a pretrial suppression hearing. (443 U.S. pp. 385-386 [61 L.Ed.2d p. 625] [opn. of Stewart, J.], 394 [61 L.Ed.2d p. 630] [conc. opn. of Burger, C. J.], 397 [61 L.Ed.2d p. 632] [conc. opn. of Powell, J.], 403 [61 L.Ed.2d p. 636] [conc. opn. of Rehnquist, J.].) Addressing contentions that the Sixth Amendment embodies common law traditions of public attendance at trials, Justices Stewart and Stevens found no such tradition in

---

[4] Justices Marshall and Blackmun did not participate.

the case of a pretrial proceeding. They concluded that the judge presiding over the suppression hearing at issue had respected any First Amendment rights that might exist by balancing free press-fair trial concerns under a "reasonable probability of prejudice" standard. (Pp. 392-393 [61 L.Ed.2d p. 629].)

The Chief Justice joined the Stewart opinion, articulating his own view that pretrial proceedings are not within the "open trial" purview of the Sixth Amendment. (Pp. 394-397 [61 L.Ed.2d pp. 630-632].) Justice Rehnquist denied that the public has any constitutional right of attendance at court. (Pp. 403-406 [61 L.Ed.2d pp. 636-638].)

Justice Powell alone expressly found a limited First Amendment access right to pretrial proceedings. That right, he said, had been satisfied in *Gannett* since access could be foreclosed on a showing that an open hearing was likely to prejudice defendant. He was careful to observe, moreover, that not all pretrial matters are so important for public scrutiny as is a suppression hearing, where "the question is whether critical, if not conclusive, evidence is to be admitted or excluded...." (P. 397, fn. 1 [61 L.Ed.2d p. 632].)

Justice Blackmun, joined by Justices Brennan, Marshall, and White, dissented, arguing that the Sixth Amendment protects not only the accused's right against secret trial but also the important public interest in access to those critical, traditionally public, judicial proceedings "within the [Constitution's] ambit." (P. 433 [61 L.Ed.2d p. 655].) A suppression hearing is such a proceeding, the dissenters noted, because even if held separately from the trial by choice it "resembles and relates to the full trial in almost every particular. Evidence is presented by means of live testimony, witnesses are sworn, and those witnesses are subject to cross-examination. Determination of the ultimate issue depends in most cases upon the trier of fact's evaluation of the evidence, and credibility is often crucial. Each side has incentive to prevail, with the result that the role of publicity as a testimonial safeguard, as a mechanism to encourage the parties, the witnesses, and the court to a strict conscientiousness in the performance of their duties, and in providing a means whereby unknown witnesses may become known, are just as important for the suppression hearing as they are for the full trial." (P. 434 [61 L.Ed.2d pp. 655-656].)

A suppression hearing is critically important, said the dissenters, because the exclusion or inclusion of evidence may so weaken the

prosecution or defense case as to preclude a trial.[5] The hearing may provide the public's only opportunity to learn about police misconduct, an issue of civic importance. And it illuminates the constitutional rules that exclude relevant evidence, a matter of public controversy. (Pp. 435-436 [61 L.Ed.2d pp. 656-657].) Thus, it may be closed only when "strictly and inescapably necessary" to ensure a fair trial. (P. 440 [61 L.Ed.2d p. 660].)

Yet the dissenters distinguished the preliminary hearing. "Such proceedings are not critical to the criminal justice system in the way the suppression-of-evidence hearing is and they are not close equivalents of the trial itself in form." That preliminary hearings, unlike trials, were traditionally private at common law (see opn. of Stewart, J., at p. 389 [61 L.Ed.2d at p. 627]; conc. opn. of Burger, C. J., at pp. 394-395 [61 L.Ed.2d at pp. 630-631]) "does not detract from [the] conclusion that pretrial suppression hearings should not be, any more than does the fact that grand juries—or preliminary proceedings such as coroner's inquests at common law—were and are secret." (P. 437 [61 L.Ed.2d p. 657].)

One year later, in *Richmond Newspapers*, seven justices found a qualified right of public attendance at the trial itself. The Chief Justice, joined by Justices Stevens and White, noted that the Bill of Rights had been adopted "against the backdrop of the long history of trials being presumptively open." (448 U.S. at p. 575 [65 L.Ed.2d at p. 988].) The open-trial tradition, the Chief Justice observed, guards against persecution or favoritism, increases public awareness of the judicial process, inspires confidence in the criminal justice system, and serves the cathartic needs of the community. (*Id.*, at pp. 570-573 [65 L.Ed.2d at pp. 985-987]; see also *In re Oliver, supra*, 333 U.S. at pp. 268-269 [92 L.Ed. at pp. 691-692].) Since First Amendment guarantees of speech, press, and assembly carry some right to see, hear, and be informed, they "prohibit government from summarily closing [places and sources of information] which had long been open to the public at the time the amendment was adopted." (448 U.S. at p. 576 [65 L.Ed.2d at p. 989].)

---

[5]Indeed, Justice Blackmun noted, that is what happened in the underlying criminal action. No felony charge went to trial in Seneca County, New York, during 1976, the year of the suppression hearing at issue. Hence a pretrial suppression hearing seemed one of the only opportunities for public scrutiny of the criminal justice system. (Pp. 434-435 [61 L.Ed.2d pp. 655-656].)

Justices Brennan and Marshall concurred separately, noting that the pretrial-publicity rationale for closing pretrial hearings does not apply at trial. (*Id.*, at p. 598, fn. 25 [65 L.Ed.2d, at p. 1004].) Justice Stewart reminded readers that First Amendment rights to attend pretrial suppression hearings had by no means been settled. (*Id.*, at p. 599 [65 L.Ed.2d at p. 1004].) Justices White and Blackmun, in separate opinions, urged the Sixth Amendment approach rejected by the majority in *Gannett*. (*Id.*, at pp. 581-582, 603 [65 L.Ed.2d at pp. 992-993, 1007].) Justice Stevens referred to his dissent in *Houchins, supra*, 438 U.S. at pages 16, 30-38 [57 L.Ed.2d at pages 565, 574-579], for the proposition that the public and media are protected under the First Amendment "from [unjustified] abridgement of their right of access to information about the operation of their government, including the Judicial Branch . . . ." (*Id.*, at p. 584 [65 L.Ed.2d at p. 994].)

We extract from this welter of views no consensus that there is a right to attend preliminary hearings. Only five of the *Gannett* court were willing to recognize access rights even to suppression hearings. Four of those (the Blackmun-Sixth Amendment group) expressly distinguished preliminary hearings. The fifth, Justice Powell, also pointed to the unique public importance of the suppression hearing, implying perhaps that he deemed other pretrial matters properly secret.

The majority in *Richmond Newspapers* stressed the traditional openness of the trial itself. Yet all seven members of that majority (the Chief Justice and Justices Stewart, Stevens, Blackmun, Brennan, Marshall, and White) had concluded in *Gannett* that preliminary hearings historically were subject to closure. Justice Stevens, though positing a broad access right in *Richmond Newspapers*, had joined the *Gannett* majority. Though only Justice Rehnquist seems to have foreclosed the possibility that he might find a right of access to preliminary hearings, the expressed views of seven of his colleagues suggest their reluctance to do so. Accordingly we decline to hold that the right of access arises under the federal Constitution.

Petitioner and amici next argue that guarantees as to speech, press, and public trial in the California Constitution (art. I, §§ 2 and 15) assure certain access to preliminary hearings. State law—constitutional, statutory, and common—does give greater protection to some rights than does the federal Constitution. (See, e.g., *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908-910 [153 Cal.Rptr. 854, 592 P.2d 341]; affd. *sub. nom., Pruneyard Shopping Center* v. *Robins*

(1980) 447 U.S. 74, 81 [64 L.Ed.2d 741, 751-752, 100 S.Ct. 2035]; *People* v. *Brisendine* (1975) 13 Cal.3d 528, 548-552 [119 Cal.Rptr. 315, 531 P.2d 1099].) Where the scope of state constitutional guarantees is at issue, their similarity or dissimilarity to the language of parallel federal provisions may be significant (see *Robins, supra,* 23 Cal.3d at p. 908), as is other evidence of the drafters' intent (see, e.g., *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 130, fn. 3 [164 Cal.Rptr. 539, 610 P.2d 436]). And state-created rights may not, of course, be elevated above countervailing federal guarantees. (*Robins, supra,* 23 Cal.3d at pp. 904-908; see *Pruneyard, supra,* 447 U.S. at p. 88 [64 L.Ed.2d at pp. 756-757].)

*Gannett* and *Richmond Newspapers* demonstrate that federal fair-trial concerns do not preclude all consideration of public rights to attend and be informed of criminal proceedings. The Supreme Court has stressed that "[t]he authors of the Bill of Rights did not undertake to assign priorities between First Amendment and Sixth Amendment rights...." (*Nebraska Press Assn., supra,* 427 U.S. 539, 561 [49 L.Ed.2d 683, 699].) Even were that court to find no federal right of access to a preliminary hearing we would not automatically infer that the Sixth Amendment grants defendant an absolute right to prevent access. The existence of a right does not give its holder an unqualified power to insist on its opposite (*Singer* v. *United States* (1965) 380 U.S. 24, 34-35 [13 L.Ed.2d 630, 637-638, 85 S.Ct. 783]); and *Pruneyard, supra,* indicates that state governments retain significant authority to favor some rights over others. (447 U.S. at p. 81 [64 L.Ed.2d at pp. 751-752].)

The California "public trial" guarantee, now contained in the Constitution's article I, section 15, has been in effect since 1879.[6] The records of the 1879 Constitutional Convention disclose no desire to alter Sixth Amendment rights. The Report of the Committee on the Preamble and Bill of Rights stated only that "[t]he amendment [providing *inter alia* a speedy public trial] consists in adding certain ... usually enumerated rights, mostly taken from article six of the amendments to the Constitution of the United States, and which seem to have been omitted [from the state's 1849 Constitution]." (1 Debates and Proceedings, Cal. Const. Convention 1878-1879, p. 179.)

---

[6]Article I, section 15 provides: "The defendant in a criminal cause has the right to a speedy public trial, to compel attendance of witnesses in the defendant's behalf, to have the assistance of counsel for the defendant's defense, to be personally present with counsel, and to be confronted with the witnesses against the defendant...."

Section 868 already was in effect when the public-trial guarantee was included in the 1879 Constitution. The delegates to the convention, if they knew of the statute, apparently saw no inconsistency between it and the constitutional amendment. We conclude that article I, section 15 provides no unqualified right in the public and media to attend a preliminary hearing.[7] (Cf. *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 524-526 [165 Cal.Rptr. 851, 612 P.2d 941], holding that defendant may insist on an open preliminary hearing.)

Is a right of access guaranteed by California's liberty-of-speech-and-press clause (art. I, § 2, subd. (a)).[8] We have recognized that in both language and scope it is broader than the First Amendment. (*Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d 899, 908-909.) And potential infringements of the people's need for informed speech call for specially astute analysis because they pose dangers to maintaining other liberties as well.

The pertinent language of article I, section 2, subdivision (a) is unchanged from the original 1849 Constitution, adopted two years earlier than section 868 (see art. I, § 9). The clause was reincorporated, apparently without debate, in the 1879 Constitution (see its art. I, § 9). As with the public-trial guarantee, and again if they knew about the statute, the drafters presumably saw no conflict between it and the speech and press rights they sought to preserve.[9]

---

[7]*Kirstowski* v. *Superior Court* (1956) 143 Cal.App.2d 745 [300 P.2d 163] is not contrary. That case held the public has independent common law and statutory rights to attend criminal trials. (See Pen. Code, §§ 686, 690.) The media contended that the right also had a base in article I, section 15 (then § 13). But the court found that the right of public attendance could be foreclosed by statute (p. 752). That was an implicit rejection of the constitutional argument.

[8]Article I, section 2, subdivision (a) provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

[9]Since *Gannett*, courts in at least three states have concluded that their own constitutions recognize a public right of access to pretrial proceedings. All relied, at least in part, on "open courts" provisions distinct from California's liberty-of-speech and public-trial guarantees. (*Ashland Pub. Co.* v. *Asbury* (Ky. 1980) 612 S.W.2d 749, 751-753; *Federated Publications, Inc.* v. *Kurtz* (1980) 94 Wn.2d 51 [615 P.2d 440, 445]; *State* ex rel. *Herald Mail Co.* v. *Hamilton* (W.Va. 1980) 267 S.E.2d 544, 546-547.) The Washington Supreme Court decided that a liberty-of-speech clause virtually identical to California's was insufficient ground for the access right. (*Federated Publications, supra*, 615 P.2d at p. 444.)

On the other hand, the 1872 Code Commissioners made clear the fair-trial interests to which they deemed section 868 so important. "If the examination is necessarily public," they wrote presciently, "the testimony will be spread before the community, and a state of opinion may be created which will render it difficult to obtain an unprejudiced jury . . . ."

Though it has reexamined section 868 on several occasions, the Legislature has never concluded that competing rights of the press or public require softening of the statute. The most recent alterations were made in the late 1970's, long after the public-access and fair-trial debate had gained prominence. Nonetheless, the only statutory changes have been slow accretions to the list of persons who may not be barred from the hearing.[10] The Legislature has never swerved from its premise that the defendant may force closure.[11]

As we have seen, several concerns are to be weighed in deciding whether speech and press freedoms imply a right of access to certain sources of government-controlled information. Matters to be examined include the traditional availability of the source to public scrutiny as well as the relative benefits and burdens of recognizing access rights. (E.g., *Richmond Newspapers, supra,* 448 U.S. 555, 576-577 [65

---

[10]As enacted in 1872 the statute read: "The magistrate must also, upon the request of the defendant, exclude from the examination every person except his clerk, the prosecutor and his counsel, the attorney-general, the district attorney of the county, the defendant and his counsel, and the officer having the defendant in custody." A 1915 proviso gave a female prosecuting witness the right to attendance of a person of her own sex "at all times." (Stats. 1915, ch. 468, § 1, p. 772.) In 1957 "court reporter and bailiff" were added to the list of persons exempt from exclusion. (Stats. 1957, ch. 1242, § 1, p. 2549.) Similar provision was made for "the investigating officer" in 1961; a sentence also was inserted stressing the magistrate's continuing power to bar prospective witnesses under section 867. (Stats. 1961, ch. 220, § 1, p. 1241.) In 1965 "the officer having custody of a prisoner witness while the prisoner is testifying" was included among those allowed to attend a closed hearing. (Stats. 1965, ch. 239, § 1, p. 1222.) The absolute right of female prosecuting witnesses to female moral support was eliminated in 1976; the magistrate was given discretion to allow a prosecuting witness of either sex to choose an attending friend. (Stats. 1976, ch. 1178, § 2 p. 5274.) Section 868.5, added in 1978, restores a limited right of moral support to prosecuting witnesses of either sex in cases of rape, sodomy, or oral copulation. (Stats. 1978, ch. 1310, § 1, 4298.)

[11]Vigorous efforts were made in the 1981 Legislature to repeal the mandatory closure provision, replacing it with an exclusionary standard that would have required case-by-case balancing of free-press and fair-trial interests. Assembly Bill No. 277 foundered, however, when the Assembly failed to concur in Senate amendments.

L.Ed.2d 973, 989] [opn. of Burger, C. J.], 583-584 [65 L.Ed.2d p. 993] [conc. opn. of Stevens, J.], 586-589 [65 L.Ed.2d pp. 995-997] [conc. opn. of Brennan, J.], 603-604 [65 L.Ed.2d p. 1007] [conc. opn. of Blackmun, J.]; *Gannett, supra,* 443 U.S. 368, 393 [61 L.Ed.2d 608, 629-630] [opn. of Stewart, J.], 397, fn. 1 [61 L.Ed.2d p. 632] [conc. opn. of Powell, J.], cf. 418-433 [61 L.Ed.2d pp. 645-655] [conc. & dis. opn. of Blackmun, J.]; *Houchins* v. *KQED, Inc., supra,* 438 U.S. 1, 30-38 [57 L.Ed.2d 553, 574-579] [dis. opn. of Stevens, J.].) The balance becomes particularly delicate when public access may endanger competing rights of substantially equal import.[12]

In *People* v. *Pompa-Ortiz, supra,* 27 Cal.3d 519 we held that California tradition and common law, implicitly acknowledged by statute, give the defendant a right to a public preliminary hearing. But we stressed that section 868 is an important exception to the state's history of open hearings. (Pp. 524-526.) For more than a century it expressly has elevated a defendant's right to close his preliminary hearing over any countervailing interest in public attendance.[13]

Access rights also depend in part on the value of exposing a particular government function to public view; and scrutiny of preliminary hearings does, of course, have many of the societal benefits that public trials and open pretrial suppression hearings help ensure. Preliminary hearings are a critical step in the accusatory process. (*Coleman* v. *Alabama* (1970) 399 U.S. 1, 7 [26 L.Ed.2d 387, 395-396, 90 S.Ct. 1999]; *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 588 [150 Cal.Rptr. 435, 586 P.2d 916].) Though they do not resemble the trial in all particulars (see *People* v. *Elliot, supra,* 54 Cal.2d 498, 504), there are many similarities. Witnesses may be cross-examined, credibility is crucial, and each side has an incentive to prevail. The hearing may reveal weaknesses in prosecution or defense evidence that forecast the ultimate

---

[12]Normally a statute that directly affects protected speech or press rights cannot be upheld against a challenge on that ground unless the law is necessary to accomplish a compelling state interest unrelated to speech and no means of serving that interest, less intrusive on speech, is available. (E.g., *Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247].) But the Supreme Court has said that free-speech and fair-trial values have equal importance. (*Nebraska Press Assn., supra,* 427 U.S. 539, 561 [49 L.Ed.2d 683, 698-699].) When a statute that restricts speech rights serves another compelling constitutional interest a more cautious standard of review seems proper, to avoid undue infringement of the nonspeech interest.

[13]Indeed, the lead opinion in *Gannett* cited section 868 as an example of traditional state policies closing pretrial proceedings.

disposition. (See *Gannett, supra,* 443 U.S. at p. 434 [61 L.Ed.2d at pp. 655-656] [conc. & dis. opn. of Blackmun, J.].)

Further, when exclusion of evidence is not at issue the preliminary hearing may turn out to be "the only judicial proceeding of substantial importance that takes place during a criminal prosecution...." (*Ibid.*) It has been reported that in 1978 only 3.2 percent of all felony-arrest dispositions in this state involved trials. (Cal. Dept. of Justice, Crime and Delinquency in Cal., pt. II, p. 10.) One study indicates that during the late 1960's in Los Angeles, the state's most populous county, almost 75 percent of the felony cases actually tried relied solely on the evidence at preliminary hearing. (Graham & Letwin, *The Preliminary Hearing in Los Angeles: Some Field Findings and Legal-Policy Observations* (1971) 18 UCLA L.Rev. 916, 931-933.)[14]

The preliminary hearing often provides a forum for adjudication of issues involving police misconduct and exclusion of evidence. (*Id.,* at pp. 942-943; see Pen. Code, § 1538.5, subds. (a)-(d), (f).) In many cases it may provide the sole occasion for public observation of the criminal-justice system. (See *Richmond Newspapers, supra,* 448 U.S. 555, 570-573 [65 L.Ed.2d 973, 985-987] [opn. of Burger, C. J.], see also pp. 593-597 [65 L.Ed.2d pp. 1000-1003] [conc. opn. of Brennan, J.]; *Gannett, supra,* 443 U.S. 368, 412-413 [61 L.Ed.2d 608, 642] [conc. & dis. opn. of Blackmun, J.].)

On the other hand, the nature and timing of preliminary hearings do present dangers that public access may prejudice fair-trial rights. As with other pretrial proceedings, the climate they may generate in advance of trial cannot always be nullified by relatively simple controls, such as sequestration and exclusion of witnesses, that are available to counter inflammatory publicity at the time of trial. (See *Richmond Newspapers, supra,* 448 U.S. 555, 580-581 [65 L.Ed.2d 973, 991-992] [opn. of Burger, C. J.], 598, fn. 25 [61 L.Ed.2d p. 1004] [conc. opn. of Brennan, J.]; *Nebraska Press Assn., supra,* 427 U.S. 539, 563-565 [49 L.Ed.2d 683, 700-701]; *Sheppard* v. *Maxwell, supra,* 384 U.S. 333, 357-362 [16 L.Ed.2d 600, 617-619].)

In California, as mentioned above, suppression-of-evidence issues often are heard during the preliminary hearing. For that reason and because magistrates may err in their evidentiary rulings a danger arises

---

[14]The pattern was not evident outside Los Angeles however, (*Ibid.*)

that prejudicial information—inadmissible at trial—will be revealed to potential jurors. (Cf. *Gannett, supra*, 443 U.S. 368, 400 [61 L.Ed.2d 608, 634] [conc. opn. of Powell, J.].)

Yet inflammatory or misleading publicity is not the only unfair publicity. Factual, relevant reporting may be prejudicial too if it produces a jury pool within which a defendant's guilt has already been ascribed. (See *Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-729 [6 L.Ed.2d 751, 755-760, 81 S.Ct. 1639]; but cf. *Murphy* v. *Florida* (1975) 421 U.S. 794, 800-801, fn. 4 [44 L.Ed.2d 589, 595, 95 S.Ct. 2031]; *Beck* v. *Washington* (1962) 369 U.S. 541, 556 [8 L.Ed.2d 98, 111, 82 S.Ct. 955]; *People* v. *Sirhan* (1972) 7 Cal.3d 710, 731-733 [102 Cal.Rptr. 385, 497 P.2d 1121].)

In *Elliot, supra*, 54 Cal.2d 498, that concern led this court to call section 868 a "fundamental safeguard" of fair-trial rights. "The testimony heard at the preliminary examination is often that of the prosecution only. The defense may remain silent if it appears that reasonable or probable cause to commit has been established. One of the main purposes of section 868 is to give the defendant the opportunity of protecting his right to an impartial and unbiased jury by preventing dissemination of this testimony, either by newspaper or other media prior to trial. [Citation] ... This right may be substantially impaired if the protection afforded by section 868 is denied." (54 Cal.2d at p. 504.)

Prejudice at times may be acute because of the superficial resemblance between preliminary hearing and trial. (See discussion *ante.*) The distinct functions served by the two proceedings are not always clear to nonlawyers. They may ascribe to a one-sided preliminary hearing the legitimacy and credibility of a trial. Accordingly, a defendant denied the protection of section 868 might feel compelled to abandon his right of silence at the hearing and to embrace a tactic of trying the case in the media.

The precedents suggest that only a proved possibility of prejudice will justify closure of a proceeding to which the public has access rights. It has been said that the propriety of closure depends on the nature and extent of the publicity a public hearing might generate, its probable effect on the jury pool, the efficacy of closure as a means of preventing prejudice, and the availability of alternative means. (*Gannett, supra*, 443 U.S. 368, 400, 402, fn. 4 [61 L.Ed.2d 608, 634-636] [conc. opn. of Powell, J.], cf. 439-444 [61 L.Ed.2d pp. 658-662] [conc. & dis. opn. of

Blackmun, J.]; see *Brian W.* v. *Superior Court* (1978) 20 Cal.3d 618, 623-626 [143 Cal.Rptr. 717, 574 P.2d 788]; cf. *Nebraska Press Assn., supra,* 427 U.S. 539, 562-570 [49 L.Ed.2d 683, 699-704].)

Case-by-case evaluation may be appropriate with respect to trials and pretrial suppression hearings conducted after the defendant has been bound over. But a preliminary hearing may be held as early as two days after arraignment. It must take place within 10 days after arraignment or plea unless the prosecution shows good cause or the defendant waives time. In any event it must occur within 60 days after arraignment or plea unless defendant consents to further delay. (Pen. Code, § 859b.)

Often, therefore, it is impossible for defendant to make a showing that in his case prejudice is likely and closure justified. The evidence required may not be available at an early stage, when community reaction and the media's attitude are not clear.[15] Moreover, defendant may have little knowledge before the hearing of the prosecution's strategy and evidence. That additionally clouds his ability to prove the value to him of closure.

Finally, certain alternate means of preventing prejudice from adverse pretrial publicity, such as gag orders or restraints on publication, can involve equal and even greater intrusions on speech and press rights. (See, e.g., *Nebraska Press Assn., supra,* 427 U.S. 539, 556-560 [49 L.Ed.2d 683, 695-698]; *Brian W., supra,* 20 Cal.3d 618, 624, fn. 7.) Changes of venue or continuances may subject the parties and courts to considerable inconvenience or expense and may even violate the defendant's right to speedy trial in the vicinage. (U.S. Const., Amends. VI, XIV; Cal. Const., art. I, § 15; *Brian W., supra,* 20 Cal.3d at p. 625.)

"[P]retrial publicity—even pervasive, adverse publicity—does not invariably lead to an unfair trial...." (*Nebraska Press Assn., supra,* 427

---

[15]In the analogous field of change-of-venue motions (see *Brian W.* v. *Superior Court, supra,* 20 Cal.3d 618, 624, fn. 7) we have said that "the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim" are to be considered. (*People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240].) Typically, a defendant seeking to move the trial will try to show that prejudicial publicity is reaching, and may be expected to influence, a large segment of the population from which jurors will be drawn. That may involve introduction of statistics about media circulation and ratings, public opinion surveys, and evidence of the nature, frequency, and timing of premotion publicity. (See *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372]; *People* v. *Manson* (1976) 61 Cal.App.3d 102, 184 [132 Cal.Rptr. 265].)

U.S. at pp. 539, 554 [49 L.Ed.2d at p. 695].) On the other hand, "[t]he costs of failure to afford a fair trial are high. In the most extreme cases ... the risk of injustice [may be] avoided when the convictions [are] reversed. But a reversal means that justice has been delayed for both the defendant and the State; in some cases, because of lapse of time retrial is impossible or further prosecution is gravely handicapped. Moreover, in borderline cases in which the conviction is not reversed, there is some possibility of an injustice unredressed...." Strong measures are necessary "to avoid exacting these costs from society or from the accused." (*Id.*, at p. 555 [49 L.Ed.2d at p. 695].)

Three-quarters of a century ago, Justice Holmes reminded us that "legislatures are ultimate guardians of the liberties ... of the people in quite as great a degree as the courts." (*Missouri, K. & T. Ry.* v. *May* (1904) 194 U.S. 267, 270 [48 L.Ed. 971, 973, 24 S.Ct. 638].) Courts traditionally defer where possible to legislation that seeks to implement crucial constitutional interests. We do not read *Richmond Newspapers* or the California Constitution to mean that the Legislature is powerless to accommodate competing free-speech and fair-trial interests. In many instances the concerns may be amenable to judicial balancing on a case-by-case basis. Yet the Legislature reasonably gives fair trial a precedence over access in certain classes of proceedings where danger of prejudice is strong but case-by-case proof of its existence appears difficult. Section 868 seems to us to have been a permitted means of protecting defendants' rights to criminal trials that are free of juror bias and fair in other respects as well. We decline to hold the statute unconstitutional.[16]

The peremptory writ of mandate is denied. The alternative writ, having served its purpose, is discharged.

---

[16]Our holding does not contravene *Brian W., supra*, 20 Cal.3d 618, which held that a trial court properly exercised its statutory authority to admit the press as an "interested person" to an otherwise closed juvenile fitness hearing (Welf. & Inst. Code, § 676 (since amended to allow public access on certain serious charges)), since the minor had shown no "reasonable likelihood" that fair-trial rights would be prejudiced were he tried as an adult. The majority were concerned with constitutional limits on the discretion to *admit* the press and did not address the Legislature's power to impose stricter controls on public and press attendance at pretrial proceedings in order to alleviate prejudicial pretrial publicity. Indeed it was suggested that the imposition of conditions —such as confidentiality of a juvenile's identity—on admittance of the press would not require necessarily the same justification as prior restraints on publication of information obtained at a hearing unconditionally public. (Pp. 623-624, fn. 6; but see *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97, 101-106 [61 L.Ed.2d 399, 403-407, 99 S.Ct. 2667].)

Mosk, J., Richardson, J., Tobriner, J.,* Taylor, J.,† Caldecott, J.,‡ and White, J.,‡ concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council. Justice Tobriner was Acting Chief Justice at the time of oral argument.

†Retired Presiding Justice of the Court of Appeal sitting under assignment by the Acting Chairperson of the Judicial Council.

‡Assigned by the Acting Chairperson of the Judicial Council.