[Crim. No. 24005. First Dist., Div. One. Dec. 1, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL LEONARD MENDONSA, Defendant and Appellant.

COUNSEL

Rommel Bondoc for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Gloria F. DeHart and Ronald D. Smetana, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ELKINGTON, J.—A jury found Mendonsa guilty of three counts of discharging a firearm into an occupied dwelling. (Pen. Code, § 246.) He has appealed from a judgment under which he was sentenced to state prison, which was rendered upon the jury's verdicts.

His contentions of error may reasonably be narrowed to three: (1) that the *evidence was not sufficient* to support the jury's verdicts, (2) that his motion for a *change of venue* was erroneously rejected, and (3) that *sentencing error* occurred.

As to the first of the contentions, we once again become concerned with the substantial evidence rule by which Mendonsa and this court are strictly bound.

When a jury's finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury, believing other evidence or drawing other inferences, might have come to a contrary conclusion. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-577 [162 Cal.Rptr. 431, 606 P.2d 738]; *Grainger* v. *Antoyan* (1957) 48 Cal.2d 805, 807 [313 P.2d 848].)

We state the evidence with reasonable inferences therefrom under the substantial evidence rule, as it could have been, and presumably was, found true by the jury.

Defendant Mendonsa was a white Caucasian, heavy set, with a beard or goatee and long brown or blonde hair. He was the "Exalted Cyclops" of the

local Klavern of the Ku Klux Klan, and he was the owner of a "dark primer gray [pickup] truck with a white camper shell and tinted bubble windows." Apartments located at 1120, 1122, and 1124 Mariposa Street of the community of Rodeo in Contra Costa County were occupied by tenants who were black. An incident occurred not far from 1120 Mariposa Street around the midevening of July 25, 1980. Two men had emerged from an automobile. One yelled at a nearby black who started to run. One fired a shot at the black while the other, identified as Mendonsa by the victim at the trial, tossed a "throwing knife" at him. (Such a throwing knife was later found in Mendonsa's home.) Later that evening, the same automobile and Mendonsa's distinctively colored and configured pickup truck were driven past the 1120, 1122, 1124 Mariposa Street apartments. Volleys from .30 caliber military carbines and a .45 caliber pistol were fired into the building. Then a short time later, the vehicles returned and the gunfiring operation was repeated. Mendonsa was identified by one of the apartment's occupants (who some time before as a newspaper boy had known him) as the driver of the pickup truck during the shooting.

A .30 caliber carbine was later seized by police officers during an unrelated arrest of one to whom it was later returned. At the time of the shooting, the gun had been in the possession of one Gary, of whom more will soon be said. Upon Mendonsa's inquiry as to what had happened to the gun, he appeared relieved to learn that the police no longer had it. An expert witness testified that upon the firearm's repossession by the police, he had compared it with bullets fired during the shooting, and concluded that it had there probably been used. The above-mentioned Gary and Mendonsa were *admittedly* together around the time of the shooting. Yet another witness testified that Mendonsa *was possibly* the driver of the involved pickup truck, and Gary *was an occupant* of the same vehicle.

During the course of their investigation, police officers talked to many witnesses, in addition to the above-mentioned two who had closely identified Mendonsa with the charged crimes.

One of them told an officer that his brother-in-law, Mendonsa, admitted to him that he was with the shooting party in the "projects," but that he was secure from arrest and prosecution because the police could not find the guns. At the trial where he was exposed to cross-examination, he denied making the statements.

Another, one Danny, had told an investigating officer that on the day after the shooting, Mendonsa had boasted about shooting up the "projects," and chasing a "nigger" and throwing a knife at him. Mendonsa had then said to him that he got "as many Klan members as possible to show force and let the 'niggers' know they cannot run the projects." (Among those so recruited, he said, was

Gary.) "They went down the street, shot them up, went to the end of the street, came back and shot them up again. . . . Mendonsa said two .30 [caliber] carbines and at least one .45 were used. One of the carbines and the .45 came from the Klan members . . . , the other carbine was owned by a guy . . . who was arrested a couple of days after the shooting and the gun had been seized but later returned. He said [the police] had them pegged but could not prove it." At the trial, Danny could not "remember" making such statements to the officer.

Danny's wife had also spoken to an officer, telling him that she overheard Danny, Mendonsa, Gary, and others conversing in her home. Mendonsa and Gary had said that one of the group "was crazy . . . and they needed an alibi for him because he had been identified." Before the "preliminary" she iterated that her earlier statement was accurate, but at the trial she could not "say whether Mendonsa said he participated in the shooting or what he said."

Mendonsa denied his guilt, and denied that he had made the above-mentioned statements attributed to him. By the clearest of implications, his testimony was that not he, but his five-foot wife (he was six feet tall), who also had long blonde hair, had used his pickup truck, in shooting up the project. And it was she, he testified, and not himself who said the police "will never catch us." His wife, he also said, had left him about two months before with the children and he did not know where she was.

On the issue of *substantial evidence,* even without the repudiated, or partially repudiated, declarations of the three recanting witnesses, we are of the opinion that the jury's verdict was abundantly supported by such evidence. With it, the evidence of Mendonsa's guilt was overwhelming.

Further, no contention is made that the declarations of the recanting witnesses, with their examination and cross-examination, were inadmissible for their substantive probative value. (See Evid. Code, §§ 791, 1235; *People* v. *Green* (1971) 3 Cal.3d 981 [92 Cal.Rptr. 494, 479 P.2d 998], *passim*; and see *People* v. *Chavez* (1980) 26 Cal.3d 334, 349-361 [161 Cal.Rptr. 762, 605 P.2d 401].) Here, the jury could reasonably believe the declarations' probative value to be high, for none of the witnesses appears to have had any conceivable motive at the time to declare falsely. And witness Danny, when asked what had effected the change in his trial testimony, stated, "there is some doubt in my mind about my safety."

We advert now to Mendonsa's contention that his motion for a *change of venue* was erroneously denied.

The motion was based upon the leading case of *Maine* v. *Superior Court* (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], and its lineage of authority.

*Maine,* following *Sheppard* v. *Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], holds that " '[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a [criminally accused's] fair trial,' . . . 'the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.' " (68 Cal.2d p. 383.) ■ And it is now firmly the law that: " ' "A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. . . . " ' " ( *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 577-578 [174 Cal.Rptr. 701, 629 P.2d 502].)

Mendonsa here contends that the people of Contra Costa County, from whom his jury were drawn, were exposed to inordinate pretrial television documentaries and newspaper articles about racial unrest and violence in which the Ku Klux Klan was prominently and unfavorably mentioned. This he argues caused that organization, and himself as one of its leaders, to become objects of scorn and hatred, thus preventing the fair trial guaranteed him by the state and federal Constitutions.

There had been much critical pretrial television and newspaper coverage of racial unrest and violence involving the Ku Klux Klan in Contra Costa County. It principally concerned the above-noted Mariposa Street incident, and another, termed the "Tara Hills" affair. The television coverage was mainly a Bay Area documentary termed Bad Moon Rising. Moreover, there was a blatantly offensive courthouse disturbance, probably witnessed by some of Mendonsa's prospective or seated jurors, by a Ku Klux Klan member or one so posing. (No complaint is lodged as to the trial court's immediate handling of the latter matter.)

■ Although such news media coverage of an ongoing criminal prosecution is certainly unfortunate, that with which we are here concerned appears to be far less intense than that of *Maine* or such well-known cases as *Sirhan* and *Manson.*

We observe also that no complaint is otherwise made by Mendonsa as to the trial court's handling of the difficult problems which were posed. Nor is there any charge of prosecutorial misconduct or undue exploitation of the attending publicity. And the *trial itself* was fair and without judicial error. It will

reasonably be said that it was conducted by the court and counsel on a high level of professional competence.

Ordinarily the question, whether one criminally accused has been, or will be, denied a fair trial because of pretrial publicity, will best be determined upon the trial jury's voir dire examination. We look to that portion of the proceedings.

It is noted initially that each of the sworn prospective jurors responded that he or she had *not* previously "heard or read anything about this case" or of Mendonsa's arrest or prosecution.

Most of the 37 prospective jurors who were asked had never heard or read of either the Mariposa Street or Tara Hills incident, or seen or heard the television documentary, Bad Moon Rising. By the few who had been exposed to one or more of such press media items, answers were given such as "nothing sticks in my mind," or "I didn't pay attention to it," or "I don't remember much of it," or "my neutrality is not affected." Many had heard nothing about Ku Klux Klan activities in the county. And several were excused by the court for cause, upon expressing strong feelings against the Ku Klux Klan.

Mendonsa, with 10 available peremptory challenges (see Pen. Code, § 1070), expressed his satisfaction with the jury as constituted when he had exhausted but 7 of them. And all who were selected had indicated an ability, and desire, to give Mendonsa a fair and impartial trial.

We further observe that reasonably, and authoritatively, there is no presumption that an accused suffers prejudice from unfriendly news stories. (*People* v. *Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240].) "[P]retrial publicity—even pervasive, adverse publicity—does not invariably lead to an unfair trial." (*Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 554 [49 L.Ed.2d 683, 695, 96 S.Ct. 237]; *San Jose Mercury-News* v. *Municipal Court* (1982) 30 Cal.3d 498, 513 [179 Cal.Rptr. 772, 638 P.2d 655].) And: " 'It is not required . . . that the jurors be totally ignorant of the facts and issues involved. . . . ' " (*People* v. *Harris, supra,* 28 Cal.3d at p. 949.)

We find ourselves aided also by the state's high court, which has pointed out other factors to be considered in determining the effect of pretrial publicity.

An *important* factor is the "nature and gravity of the crime." (*Martinez* v. *Superior Court, supra,* 29 Cal.3d 574, 578.) Here, the crime itself does not rank particularly high in either its penalty or gravity. (See Pen. Code, § 246.) "In a small town, in contrast to a large metropolitan area, a major crime is likely to be embedded in the public consciousness . . . despite exten-

sive and sensational coverage. . . ." (*Martinez* v. *Superior Court, supra,* p. 581; and see *Maine* v. *Superior Court, supra,* 68 Cal.2d 375, 387.) Contra Costa County is part of a large metropolitan area. Another such factor is "the status of the defendant in the community, and the popularity and prominence of the victim." (*People* v. *Harris, supra,* 28 Cal.3d 935, 948.) Here, although the Ku Klux Klan unquestionably had developed some notoriety, none of the prospective jurors remembered hearing of Mendonsa or his intended victims. Postponement of the trial will often ameliorate the effect of adverse pretrial publicity. (*Brian W.* v. *Superior Court* (1978) 20 Cal.3d 618, 624 [143 Cal.Rptr. 717, 574 P.2d 788].) Here, Mendonsa's trial was held almost five months after the crimes' commission.

■ Upon such a contention as is here made by Mendonsa, "appellate tribunals have the duty to make an *independent evaluation* of the circumstances [thus to] satisfy themselves . . . that every defendant [receives] a fair and impartial trial." (*Maine* v. *Superior Court, supra,* 68 Cal.2d 375, 382.) ■ We have done so, and conclude the pretrial publicity did not deny Mendonsa a fair and impartial trial.

■ We reach Mendonsa's final contention that he was erroneously sentenced when the trial court found "several aggravating circumstances and . . . that they outweigh 'any' mitigating circumstances, without making any finding what, if any, mitigating circumstances apply." Such a contention was held invalid in *People* v. *White* (1981) 117 Cal.App.3d 270, 280 [172 Cal.Rptr. 612], where the court said:

"Defendant's contention that the trial court failed to consider the circumstances in mitigation is without merit. A trial court is not required to indicate its reasons for rejecting a mitigating factor. [Citation.] It is also the rule that, unless the record affirmatively reflects otherwise, the trial court will be deemed to have considered the relevant criteria, such as mitigating circumstances, enumerated in the sentencing rules. [Citation.] Hence, on the record before us, it must be presumed that the trial court did consider the mitigating circumstances listed in the probation report, but concluded that they were outweighed by the other facts which the trial court relied upon in selecting the upper term of imprisonment."

We apply that rule and its rationale here.

A related contention rests upon the trial court's statement that with regard to consecutive sentencing it had considered "these factors all again as set forth by the Judicial Council." It is argued without citation of authority that: "This is a patent prohibited double use of factors." We do not find it so.

The judgment is affirmed.

Racanelli, P. J., and Newsom, J., concurred.

A petition for a rehearing was denied December 22, 1982, and appellant's petition for a hearing by the Supreme Court was denied January 26, 1983.