Filed 6/12/13  P. v. Daniels CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B243981 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA086163) |
| v. | |
| TANA COLONIAL DANIELS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell Mavis, Judge.  Affirmed.

California Appellate Project, Jonathan B. Steiner and Ann Krausz, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Tana Colonial Daniels, appeals from the judgment entered following a jury trial which resulted in his conviction of the willful infliction of corporal injury on a "spouse/cohabitant/child's parent" (Pen. Code, § 273.5, subd. (a))[1] and his admission he previously had been convicted of a serious and violent felony, assault with a firearm (§ 245, subd. (a)(2)), within the meaning of section 1170, subdivision (a)(3) and the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). The trial court sentenced Daniels to four years in state prison. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.

As of 2012, Shalynn Brown[2] and Daniels had been involved in a relationship for approximately 13 years and had been married for between three and four years. The couple had four children.

Between 3:30 and 4:00 in the afternoon on April 1, 2012, Brown arrived at the couple's home at 372 East Sacramento Street in Altadena. The children were playing "in the front with [a] neighbor," who was watching them. A man Brown had dated a few times, Travor Davis, was sitting in his car in one of the two stalls in Brown's driveway. Davis had never before been to Brown's home and she did not know how he had gotten her address. Brown did not know where Davis lived as the two generally met at a night club or City Walk. Davis knew Brown was married, however Brown had never told Daniels about Davis and she did not know if Daniels knew about him. Davis had never met any of Brown's children.

Brown pulled in next to Davis, got out of her car, then realized that Davis had gotten out of his car and was standing right behind her. Brown owed Davis approximately $200, which she had used to pay for, among other things, her gas bill.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Brown had suffered two prior criminal convictions, one in 2001 for petty theft and one in 2008 for grand theft. In 2002, Brown was arrested, but never charged, for an incident involving "domestic violence."

2

When Davis asked her for the money back, she told him that she did not have it and the two began to argue. Davis, who was yelling at Brown, then pushed her into her house and, as they were standing in the dining room, pulled Brown toward him and hit her in her eye with his fist. After hitting Brown, Davis "took off."

Brown, who suffered a cut under her eye,[3] called 911 and, although she and Davis had no children together, she told the operator that her "baby's father" had hit her.[4] Brown indicated she had lied about who had hit her because Daniels had been cheating on her and, if he had not done so, she "probably never would [have been] in this predicament . . . ." She was seeing Davis simply because Daniels had been having affairs.

When an ambulance and sheriff's deputies arrived at Brown's home, she told the deputies her boyfriend, Travor Davis, had hit her and she gave to the deputies Davis's phone number, although the last time she had tried to call him she had been told the number had been disconnected. She also brought up Daniels. Brown initially told the police that her " 'boyfriend hit [her.]" She then said, " 'Well, Mr. Daniels.' " She named Daniels after considering how he had been "cheating and had several relationships . . . ."

Later that evening, because she was afraid Davis might come back to her home, Brown took her children and went to her grandmother's house in Los Angeles. Brown did not know if Daniels went to their home in Altadena that night. Brown, however, saw Daniels the following day and told him she had been "jumped." She did not tell him the injury to her eye had been inflicted by Davis because she was "kind of scared." Brown still loved Daniels and wished to remain married to him.

---

[3]     Brown still has a small scar under her eye as a result of the incident.

[4]     A tape recording of the 911 call was admitted into evidence. During the call, Brown asks the operator if someone can come to her home, then indicates her "baby daddy just socked [her] in [her] eye." Brown then states he "just bust [her] in [her] . . . face and [her] face is bleeding." When the operator asks Brown if she needs paramedics, Brown answers, "Yeah."

3

At some point, Brown spoke with a Detective Ventigan. When he asked her who had hit her in the eye, Brown told him it had been Travor Davis. The detective then asked Brown whether she was "seeking prosecution in the case" and she told the detective, " 'No.' " The detective apparently told Brown they did not need her anyway as they had photographs of her injury. Brown indicated that she did not wish to prosecute Davis because she was afraid of him and, since she had discovered he knew where she lived, she had been attempting to move.

After the April 1st incident, a case was filed against Daniels. Once Brown became aware of the matter, she went to the district attorney's office to tell them they were prosecuting the wrong person. There, someone told her nothing could be done about it "until the court date."

Brown again spoke with Detective Ventigan, who again told her they did not need her as they had "the pictures." The detective also told Brown he did not believe her and he was "going to go ahead and present [the case] to the D.A.'s office."

Brown indicated that, at proceedings held before the preliminary hearing, she attempted to tell the prosecutor the wrong person had been charged. The prosecutor simply told Brown to " 'sit down' " and that she had " 'heard that before.' "

On the day of the preliminary hearing, Brown testified "Travor Davis did it." Brown stated Davis, not Daniels, had been the one who hit her.

At trial, Brown admitted that, when she called the police after the incident, she had said her "children's father or baby's daddy" had hit her. She testified she had said that because "in the heat of the moment at that time [she was] pissed off, for lack of a better [term], against Mr. Daniels because [she] didn't think this would have happened if [they had] had a regular marriage[.]" Brown also admitted, although she and the children lived on Sacramento Street in Altadena, Daniels was "rarely there."

Los Angeles County Deputy Sheriff Jaime Banuelos was assigned to the Altadena Station. At approximately 3:30 or 4:00 in the afternoon on April 1, 2012, Banuelos and his partner responded to a call directing them to Brown's home on Sacramento Street. Banuelos understood the incident involved domestic violence.

4

After arriving at the address, Banuelos and his partner, Deputy Abdulfattah, spoke with Brown. Brown "seemed to be kind of shaken up" and "looked like she . . . had been crying[.]" She also "had a gash under her right eye." Although Brown refused any treatment for her injury, Banuelos and his partner, who believed the cut was " 'significant,' " called the Fire Department's ambulance.

Banuelos asked Brown how she had gotten the injury and she told the deputy "her husband[, Tana Daniels,] had [done] this to her, [and] that he had struck her with . . . his closed left fist . . . ." When the deputy asked Brown why her husband had done that, she indicated they had been "having an argument over finances." Banuelos asked if there was a place where he could locate Daniels and Brown gave him an address on West 71st Street in Los Angeles. During their conversation, Brown never mentioned Travor Davis and never indicated "that she had a boyfriend who had caused the injury on her face[.]" She did, however, mention Daniels several times.

Joey Ventigan is a detective with the Los Angeles County Sheriff's Department who, in 2012, worked out of the Altadena Station. Ventigan was the detective assigned to investigate the April 1st incident which occurred "between Shalynn Brown and Tana Daniels[.]" Ventigan was assigned to the case on April 4, 2012 and he spoke with Brown on the telephone that day. When Ventigan asked Brown who had caused the injury to her face, she answered, "[h]er husband, Tana Daniels." Brown never mentioned the name Travor Davis.

2. *Procedural history.*

Following a preliminary hearing, an information was filed on June 15, 2012 in which Daniels was charged with one count of "corporal injury to [a] spouse/cohabitant/child's parent" in violation of section 273.5, subdivision (a), a felony. It was further alleged Daniels previously had been convicted of the serious felony (§ 1192.7) and the violent felony (§ 667.5, subd. (c)) of assault with a firearm (§ 245, subd. (a)(2)), requiring any sentence imposed for the felony alleged in count 1 be served in state prison pursuant to section 1170, subdivision (a)(3). In addition, the prior assault subjected Daniels to the terms of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12,

5

subds. (a)-(d)).  At proceedings held on June 27, 2012, Daniels entered a plea of not guilty to the charge alleged in count 1.

On September 6, 2012, the matter was called for a jury trial.  On that same day, the trial court impaneled a jury of 12 jurors and 2 alternates.  Opening statements and the giving of evidence began the following day.

After all the evidence had been presented, defense counsel made a motion for entry of a judgment of acquittal (§ 1118.1).  The trial court, however, denied the motion.

Before the parties presented their arguments, defense counsel objected to the prosecutor showing the photograph of Brown's injury on the overhead monitor.  Counsel argued that to show to the jury such a large image of the wound would be prejudicial and would serve "no other purpose than to try to influence the jury just based on the photograph."  (See Evid. Code, § 352.)  The trial court denied the motion, indicating it would allow the prosecutor to "show [the picture,] then remove it."  The court commented, "It's easier to see [than the photograph] and [the prosecutor] can make arguments based on it."

At 3:55 p.m. on September 7, 2012, after the trial court had instructed the jury and the parties had presented their arguments, the jurors retired to begin their deliberations.  At 4:05 p.m., the jurors recessed until 9:00 a.m. the following Monday, September 10, 2012.

On the morning of September 10, 2012, the jury requested that the testimony of Deputies Banuelos and Ventigan be read back to them.  After the testimony had been read back, the jury resumed its deliberations.  Then, at 2:03 p.m., the jury "buzzed" the trial court indicating it had reached a verdict.  After defense counsel indicated, if there was a conviction, Daniels "would waive jury for the prior," the trial court advised Daniels of his right to a jury trial, his right to confront and cross-examine witnesses against him, his right to subpoena witnesses to testify in his defense at no cost to him and his right to remain silent.  Daniels indicated he understood his rights and wished to waive them with regard to the allegation he had a prior serious and violent felony conviction.  The trial court responded, "Then, if there is a conviction, . . . there will be a court trial on that."

6

The court clerk then read the verdict, which indicated the jury had found Daniels "guilty of the crime of corporal injury to [a] spouse, a mother of his child, on or about April 1st, 2012, in violation of . . . section 273.5[, subdivision] (a), a felony . . . ."

After reviewing the People's "packet," Daniels indicated he did not wish to have a court trial on the alleged prior conviction. Daniels waived his right to a court trial, then admitted he previously had been convicted of assault with a firearm in violation of section 245, subdivision (a)(2).

Over the People's objection, Daniels asked the trial court for "a couple of weeks" to take care of business before he surrendered for sentencing.[5] After reviewing Daniels's criminal history, including his probation report, the court denied the request and remanded Daniels. The trial court indicted Daniels's history showed that he had committed "crimes of violence," including the one he had just been found guilty of, and the court was "not going to take a chance on that."

Daniels was sentenced on September 12, 2012. At those proceedings, Brown's mother, Tracy Davenport, addressed the court and requested that the court show leniency toward her son-in-law. Davenport stated Daniels had been a good father, had made an effort to support his family and, at the time of this offense, had been starting a business. According to Davenport, Daniels was an upstanding young man who had been like a son to her. After then hearing from both counsel, the trial court imposed the low term of two years in state prison for Daniels's conviction of the willful infliction of corporal injury on a spouse, then doubled the term to four years pursuant to the Three Strikes law. The trial court commented, although it had been considering imposing the mid-term, Davenport had persuaded him the low term was appropriate. The court stated it had never before had "the mother [of the victim] come into court" to speak on behalf of a defendant.

---

[5]     Daniels had been out of custody on bail during the prior proceedings.

7

The trial court awarded Daniels presentence custody credit for 39 days actually served and 39 days of good time/work time, for a total of 78 days.[6] The court ordered Daniels to pay a $240 restitution fine (§ 1202.4, subd. (b)), a stayed $240 parole revocation restitution fine (§ 1202.45), a $40 court security fee (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction assessment (Gov. Code, § 70373).

Daniels filed a timely notice of appeal on September 12, 2012.

**CONTENTIONS**

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed March 20, 2013, the clerk of this court advised Daniels to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. After being granted an extension of time within which to do so, on April 25, 2013 Daniels filed a letter brief in which he argued several points. Initially, he asserted the panel of jurors who tried him was "unconstitutionally incompetent." Daniels next argued, when the court reporter read back testimony requested by the jury, she made several errors which "ma[d]e the testimony difficult to understand." Daniels then contended his trial counsel had been ineffective. Finally, Daniels asserted he is "not the person who[] committed this crime."

With regard to the competency of the jurors, Daniels referred to the portion of the trial transcript which reflected the trial court's explanation to the prospective jurors the nature of the crime of which Daniels had been accused. The trial court then asked Prospective Juror No. 1, "[I]f you had to do something as ridiculous right now as to vote, guilty or not guilty, how [would] you vote?" Prospective Juror No. 1 responded, "I—I can't make a call just based on that." The trial court then asked the same question of prospective jurors 2 and 3 and they gave the "[s]ame response." The trial court then asked the panel, "Is there anyone who would have a different response than, you know, 'I

---

[6] On February 8, 2013, the trial court granted Daniels's motion to correct his presentence custody credits to show 56 days actually served and 56 days of good time/work time, for a total of 112 days.

8

can't make a decision right now'?  [¶]  Anybody have a different response than that?  [¶]
No hands."  The court then addressed Prospective Juror No. 4 and stated, "So, Juror
No. 4, we talked about who has got the burden of proof[,] right?"  Prospective Juror
No. 4 responded, "Yes."  "The prosecutor, the People there."  The following colloquy
then occurred:  "The court:  Right.  [¶]  Prospective Juror No. 4:  Right.  [¶]  The court:
So if you have not heard evidence—[¶]  Prospective Juror No. 4:  Can't make a decision
without evidence.  [¶]  The court:  That's what most people would think if they were
making a decision in their everyday lives, but in a courtroom where the People have the
burden of proving something beyond a reasonable doubt, if they have not proven it, and
since you haven't heard any evidence at this point, your vote would have to be not guilty.
[¶]  Everybody see that?  [¶]  Prospective Juror No. 4:  Right.  [¶]  The court:  That's
what really makes the rubber meet the road in terms of a presumption of innocence.  You
hear that all the time in movies or maybe on TV or something, but when someone says
presumed innocent, that's what that means.  That means unless and until the People can
prove the charge beyond a reasonable doubt, your vote must be not guilty.  [¶]  So, Juror
No. 1, how would you vote?  [¶]  Prospective Juror No. 1:  Not guilty.  [¶]  The court:  2?
[¶]  Prospective Juror No. 2:  Not guilty.  [¶]  The court:  3?  [¶]  Prospective Juror No. 3:
Not guilty.  [¶]  The court:  Is there anyone else who would vote something other than not
guilty?  [¶]  I see no hands."

Based on these proceedings, it cannot be said the jurors who tried Daniels were
"unconstitutionally incompetent."  Although they may not have initially understood the
prosecution's burden of proof, it was clearly established that, after the trial court
discussed it with a number of individual jurors, each of the prospective jurors understood
that in order to convict Daniels of the alleged crime the prosecution was required to prove
him guilty beyond a reasonable doubt.  A reading of the record indicates, following its
discussion with prospective jurors 1 through 4, when the trial court asked all of the
prospective jurors if, at that point in the proceedings, there was anyone who would vote
other than that Daniels was "not guilty," the trial court saw "no hands."

9

Daniels next contended that when the court reporter read back testimony requested by the jury, she made several errors which "ma[d]e the testimony difficult to understand[.]" The contention is without merit. " ' "It is presumed that official duty has been regularly performed. . . ." (Evid. Code, § 664.) This presumption applies to . . . court reporters . . . .' (*People v. Wader* (1993) 5 Cal.4th 610, 661.) Therefore we assume the reporter properly read [back] the testimony [requested] by the jury." (*People v. Ayala* (2000) 23 Cal.4th 225, 289.)

Daniels's contention his trial counsel was ineffective is also without merit. "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.]" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.) If the defendant makes an insufficient showing as to either component, the claim must fail. (*People v. Holt* (1997) 15 Cal.4th 619, 703.)

Daniels first asserts his trial counsel failed to consider his objections to various potential jurors and allowed individuals who had indicated they would not presume him innocent to remain on the jury. However the record, as indicated above, shows all of the potential jurors had indicated they understood Daniels was to be presumed innocent until the prosecutor proved otherwise beyond a reasonable doubt. Under these circumstances, it cannot be said any of the jurors accepted by defense counsel would not have presumed Daniels was innocent until the prosecutor proved him guilty of the alleged charge.

Daniels asserts, on another occasion, his counsel became so confused he referred to Travor Davis as "Travor Daniels." During argument, counsel stated Brown testified "she wouldn't have been cheating had she been getting the type of companionship that she needed and that in this tit-for-tat world she came into contact with this Travor Daniels [(*sic*)] who she was getting things from, some money and other things that she alluded to, and that at some point this tit-for-tat resulted in Mr. Davis assaulting her, and at that point in time, she got revenge. It was her opportunity to point the finger at Mr. Daniels."

10

Counsel continued, "The issue here is not whether Tana Daniels hit Shalynn Brown. It's not whether Shalynn Brown was injured. The issue is that Tana Daniels did not injure Shalynn Brown because the testimony that you have heard in court under oath is that he was not even present at 372 East Sacramento Street on April 1st of 2012. The complaining witness admits this under oath. She admits she lied . . . ." In view of the argument presented by counsel after he mistakenly referred to Travor Davis as Travor Daniels, it cannot be said Daniels suffered any prejudice. Counsel's point was that Brown had lied under oath and he clearly made that point.

Daniels next argues, without consulting him, counsel waived his presence for any read back of testimony. While the record indicates counsel initially stated he was waiving Daniels's presence, it also indicates counsel then stated he was going to discuss the matter with Daniels. From a further reading of the record, it can be inferred defense counsel and Daniels had such a discussion. When the jury then requested certain testimony to be read back to them, the prosecutor, defense counsel and Daniels were present.

Finally, Daniels contends his trial counsel was ineffective because he failed to accurately determine the number of presentence custody credits to which Daniels was entitled. This, however, was a simple clerical error which was easily corrected when it was brought to the attention of the trial court. Under these circumstances, Daniels suffered no prejudice from the error. (See *People v. Holt, supra,* 15 Cal.4th at p. 703.)

Daniels final contention is that he was convicted of a crime he did not commit. We note, "[w]hen a jury's finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury, believing other evidence or drawing other inferences, might have come to a contrary conclusion." (*People v. Mendonsa* (1982) 137 Cal.App.3d 888, 891, italics in original,

11

citing *People v. Johnson* (1980) 26 Cal.3d 557, 576-577.)  Here, a review of the evidence presented supports the jury's finding Daniels was guilty of willfully inflicting corporal injury on Brown.  Although Brown's testimony was at times inconsistent, the testimony of the two law enforcement officers and the tape recording of the 911 call were not.  All three indicated Brown had stated Daniels was the individual who had attacked her.  The evidence of Daniels's guilt was substantial.

**REVIEW ON APPEAL**

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities.  (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

CROSKEY, Acting P. J.

ALDRICH, J.